In the Matter of the Claims of LOUISE DUFFY et al., Respondents, against JACOB KEDENBURG et al., Doing Business as KEDENBURG RACING ASSOCIATES, et al., Appellants.

WORKMEN'S COMPENSATON BOARD, Respondent.

Third Department, March 7, 1951.

*Frank L. Wiswall, Harry A. Davidow, Walter J. Mahoney* and *Carl O. Olson* for Jacob Kedenburg and other, appellants.

*Bernard F. Farley* for Great American Indemnity Company, appellant.

*Nathaniel L. Goldstein, Attorney-General* (*Roy Wiedersum* and *Daniel Polansky* of counsel), for Workmen's Compensation Board, respondent.

BREWSTER, J. There is no dispute as to the bare factual situation out of which these claims arose. The deceased husband of each claimant met with fatal injuries while participating in a midget automobile race conducted in the course of the business of the appellants Kedenburg and Davidow, a partnership doing business as Kedenburg Racing Associates (hereinafter called the Promoter), at Freeport, Long Island.

The chief issue presented is whether on the evidence shown the decedents met their fatal injuries in the status of employees of the Promoter within the purview of the statute (Workmen's Compensation Law), or as independent contractors. There is a secondary issue of coverage under the workmen's compensation insurance policy issued to the Promoter by the appellant carrier.

Decedents were members of a nonprofit organization, viz.: Automobile Racing Association, Inc. (hereinafter called A. R. A.), a domestic membership corporation; and as such members were participating for their own account in the races wherein they met their deaths. The membership of the A. R. A. is composed of dues-paying owners and race drivers of midget racing automobiles. At the times in question decedents were, respectively, contesting in a race by driving a racing car owned by one of their fellow members. This was in pursuance of a written agreement between their corporation, the A. R. A., and the Promoter, the relevant provisions of which provided that: A. R. A. would " cause its members to supply cars and drivers " to the Promoter for the conduct of " Midget Automobile Racing Meetings " at certain of its race tracks, including the one at Freeport, Long Island, and exclusively so as to Nassau and other counties, during the 1947 racing season which began in May and ended with December; the Promoter would permit only

members of the A. R. A. in good standing to participate in the race meetings, and would provide first aid facilities including two ambulances and a doctor at the race track prior to the commencement of races; the race meetings would be conducted pursuant to the rules of the A. R. A., which were made a part of the agreement; the parties would hire, determine his salary and each pay half thereof to a named referee who would preside over the race meetings, and they would abide by his decisions concerning the aforesaid rules of racing. Fifty percent of the net proceeds from the venture (gate receipts, less taxes thereon), would be " paid to the winning drivers and owners pursuant to the distribution table contained in official Rule Book " of the A. R. A. which was attached to the agreement. Other evidence as to the operation of the aforesaid contractual arrangement and appertaining to the relation which decedents bore to the Promoter, and comments thereon follow: (1) A. R. A. procured the contestants from among members, by notification to them of the place and date of the race meeting, and, under the contract (per the rules, annexed as a part thereof), the members were obliged to notify the Promoter at least four hours before the race if they could not appear. (2) Supervision, control and disciplining of the contestants, either the owner or the driver or the racing vehicle, as respects qualifications, capability and conduct while upon the race grounds, were regulated by the aforesaid rules under which the executive power concerning all such matters was placed wholly and solely in the technical committee of the A. R. A. As regards those matters the Promoter had no power to act. (3) The rules provided that the contestants, whether owner or driver, upon entry to the grounds, pay certain prescribed fees for the benefit of the A. R. A.'s hospital fund; and one Venth, an employee of the Promoter, customarily collected these fees from the entrants whether owner or driver, and paid them over to the A. R. A. This, it appears, was his only contact with them, and was done only as an accommodation to the A. R. A., and for which it paid him; and not as any service to the Promoter in any supervision or control over the entrants. Venth had other duties in his service of the Promoter among which was the procurement of written releases from the entrants of damage claims wherein they (including decedents), expressly characterized themselves as independent contractors. (4) One Lehmann was treasurer of the A. R. A. As was customary he was present on the nights in question. He had a program concession, and in

addition the Promoter paid him $15 per night for acting as one of the scorers. He was also active in apportioning the shares of the money proceeds among the contestants and the A. R. A. There is no evidence that any of his service to the Promoter consisted of any supervision or control over the contestants as regards the purposes and the activities in which they engaged. (5) One Hager was an employee of the Promoter. He was the race steward or handicapper. He set up the races and assigned and positioned the race cars in the various events. However, he did this solely in a routine in accordance with their record of prior earnings or winnings. He did not otherwise handicap or control the drivers. (6) The drivers, as free agents, made their own arrangements with the car owners as to what cars they drove and the races they entered, and their earnings were derived from the net proceeds allotted to the contestants in accordance with the contract. The A. R. A. rules determined the contractual division of such proceeds among the contesting cars in accordance with the results of a given heat or race. If the driver was not the owner of the car he drove he made his own arrangement with the owner for his share of the winnings, and that was his only compensation. Aside from the foregoing there is no evidence that the Promoter or its other employees exercised any regulation or control as respects the activity of the racing cars or their drivers, or had any right to do so.

The common-law definition of an independent contractor is applicable to cases arising under the Workmen's Compensation Law. To be compensable under that act the injury must have occurred in the duration of a master and servant relationship. (*Matter of Beach* v. *Velzy,* 238 N. Y. 100.) The details in contractual relations which can render it as one of that relation or instead one of independent contractorship may in given cases render the classification difficult. Facts peculiar to a given case and the objective which requires the characterization may render the division line somewhat finely drawn. However, the rule which governs is firmly established. Merely that the questioned employment is necessary to the conduct of the owner's business is not determinative. It has been uniformly held that to constitute a master and servant relationship it is essential that there be some right or measure of control on the part of the employer as respects the mode and manner in which the objective of the undertaking is to be achieved and as to the means employed or used in its accomplishment. Authority tells us that the test to determine whether one who renders service to another does so

as an independent contractor or as a servant, " is to ascertain whether he renders the service in the course of an independent occupation, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished." (*Hexamer* v. *Webb,* 101 N. Y. 377, 385.)

In the record before us we look in vain for evidentiary support of the board's findings that the decedents met their deaths while in the employ of the appellant partnership in a master and servant relationship. Rather, the evidence discloses decedents' acceptance of the obligations of a contract, made for their benefit, between their association and the Promoter, in the performance whereof, as to its mode and manner and means employed, they were wholly independent of the will or wishes of the Promoter. The gist of the thing contracted for was the actual performance of the races wherein they lost their lives. The evidence clearly shows that therein they were engaged in the pursuit of a specialized kind of automobile racing as an independent calling. Only in the production of the thing contracted for, viz.: the race performance, did they represent the will of the Promoter. In their decisions whether to enter the races the Promoter had no voice, and after their decisions to do so it had no power to direct or govern their conduct. As to the preparations for and the performance of races themselves, it is clear beyond the peradventure of conflicting inferences, that under the contractual provisions which obtained and were operative at all times the Promoter had no more control or supervision over them than did a paying spectator.

As regards the question of policy coverage, we agree with the board's finding and decision that it was effective to cover generally the Promotor's employees at the Freeport track since the business conducted there emanated and may be said to have been conducted from the named location. However, the policy carried an indorsement which expressly excluded coverage as to "midget car drivers, * * * attendants and others connected with the actual operations of midget racing cars." The broad language of the statute (Workmen's Compensation Law, § 54, subd. 4), as to what the policy is deemed to cover does not prohibit the contract's exclusion of a specified kind or class of employee activity or relationship as was done here. (*Matter of Zoller* v. *Boge,* 267 App. Div. 794.) Upon this additional ground we consider the finding as to coverage erroneous.

The decisions and awards should be reversed on the law and claims dismissed, with costs against the Workmen's Compensation Board.

HEFFERNAN, J. (dissenting). I dissent and vote to affirm the awards. As I read this record there is evidence from which the board was justified in finding that the decedents were employees and not independent contractors. Decedents were members of Automobile Racing Association, Inc. That corporation had an agreement with Kedenburg and Davidow. In reading that agreement we must look to the substance and not to the form. When this agreement is carefully analyzed it is quite evident that it is but a shallow subterfuge to evade the provisions of the Workmen's Compensation Law.

The contention of the appellant carrier that the decedents were not covered by the insurance policy is clearly without any merit. At no time during the proceedings before the Workmen's Compensation Board did the carrier raise the question that its policy did not cover the employee of Kedenburg and Davidow who were engaged in the midget auto operations. The representative of the carrier repeatedly declared at the hearings that the claims were being contested on the ground that the decedents were not employees. In its notice of controversy the carrier raised only the issue of the employer-employee relationship. There is testimony too on the part of Kedenburg that the employers carried workmen's compensation on the employees who were employed at the Freeport Stadium. Then too following the decision of the referee the carrier requested a review of the referee's decision. In that application it urged only the issue of employer-employee relationship and made no reference whatever to the contention which it now raises that its policy excluded decedents. Under those circumstances the carrier had waived that objection.

FOSTER, P. J., BERGAN and COON, JJ., concur with BREWSTER, J.; HEFFERNAN, J., dissents, in a memorandum.

Decisions and awards reversed, on the law, and claims dismissed, with costs against the Workmen's Compensation Board.